UNITED STATES of America, Plaintiff,

v.

Alberto SAN PEDRO, et al., Defendants.

No. 91–105–CR.

United States District Court,
S.D. Florida.

Dec. 27, 1991.

Dexter W. Lehtinen, Caroline Heck, and Geoffrey Brigham, Miami, Fla., for U.S.

Fred A. Schwartz, Jose M. Quinon, and G. Richard Strafer, Miami, Fla., for defendant San Pedro.

## ORDER

GONZALEZ, District Judge.

THIS CAUSE has come before the Court upon the defendant San Pedro's Motion To Dismiss Indictment. By prior order, the Court referred the motion to United States Magistrate Judge Lurana S. Snow for Report and Recommendation concerning the disposition of the motion.

Magistrate Judge Snow conducted an evidentiary hearing spanning several days in July and August of 1991. On October 21, 1991, Magistrate Judge Snow submitted a fifty-eight (58) page Report in which she recommends that the Court grant the defendant's motion and dismiss the indictment. The government has filed objections to the Report, and the defendant has submitted a Response to the government's objections. Additionally, Dexter Lehtinen, the United States Attorney for the Southern District of Florida, has filed a Supplemental Motion To Reject And/Or Strike Portions of the Magistrate's Report and Recommendation Regarding Findings With Respect To Marcella Cohen, Scott Behnke, and Diana L.W. Fernandez.

On November 26, 1991, the Court entertained argument of counsel concerning the

1. The Court overruled the defendant San Pedro's objections to the Magistrate Judge's Report and Recommendation by prior order.

2. As explained below, the Court will adopt, with certain exceptions, the magistrate judge's factual findings. The Court will recount certain of the significant facts in this order, supplementing or

government's objections [1] and the United States Attorney's Motion To Strike. Additionally, the Court has conducted a careful, *de novo* review of the magistrate judge's Report and the voluminous record herein. At long last, the defendant's motion to dismiss is ripe for disposition.

## I. Factual and Procedural Background

The disposition of the defendant's motion to dismiss turns on a contract, a plea agreement. The consummation of that plea agreement, and the events which preceded and followed its consummation, is a story unto itself and necessarily provides the starting point for the Court's analysis.[2]

### A. The Formation of the Plea Agreement

On August 28, 1986, the State of Florida filed an information against San Pedro charging him with violating Florida's RICO statute, as well as various predicate offenses. After a trial, a jury convicted San Pedro of conspiring to traffic in cocaine and on five counts of unlawful compensation. The jury acquitted the defendant on all other counts. The state court sentenced the defendant to serve 5½ years in prison.

Prior to San Pedro's release from state custody, the United States government sought to indict him on federal charges. On October 7, 1988, a grand jury of the United States District Court for the Southern District of Florida returned a three count indictment charging San Pedro with conspiracy to commit bribery (one count) and bribery (two counts). *United States v. San Pedro*, No. 88–677–CR–ARONOVITZ. The defendant was writted into federal custody on December 1, 1988, and was ordered detained prior to trial. San Pedro pleaded not guilty to the charges, and United States District Judge Sidney M. Aronovitz specially set San Pedro's case for trial on July 11, 1989.

altering the magistrate judge's findings as necessary. To the extent any statement of fact in this order conflicts with any statement of fact in the magistrate judge's Report, even those factual findings of the magistrate judge which the Court has incorporated into this order, the finding expressed in this order controls.

San Pedro engaged Richard Sharpstein to defend him against the federal charges. In June of 1989, as the trial date approached, Sharpstein contacted Assistant United States Attorney Peter Outerbridge—Chief of the Public Corruption/Public Integrity Division of the United States Attorney's office in the Southern District of Florida—and asked Outerbridge whether the United States would be willing negotiate with San Pedro in exchange for San Pedro's cooperation. Outerbridge communicated Sharpstein's offer to the United States Attorney Dexter Lehtinen because Lehtinen was personally handling the prosecution of San Pedro. Near the end of June 1989, Sharpstein, Outerbridge, and Lehtinen decided during a conference call that the government would strike a bargain with San Pedro: San Pedro would plead guilty to one count of the indictment and would cooperate with the federal government.

On July 5, 1989—after a proposed plea agreement had been drafted—Lehtinen, Outerbridge, Sharpstein, Patricia Jean Kyle (co-counsel to San Pedro), FBI Special Agents Brian J. Jerome and George R. Kiszynski, and San Pedro all met at the United States Courthouse in Miami for the purpose of obtaining a proffer from San Pedro concerning information he could provide the government. San Pedro provided those present with a detailed proffer relating primarily to corruption in the City of Hialeah, Florida. Agents Jerome and Kiszynski summarized the proffer in a five page report. *See* Defendant's Exhibit 2, under seal.

Prior to the defendant's proffer, Lehtinen had summarized the terms of the contemplated plea agreement. Significantly, however, there was no discussion during the July 5, 1989, meeting of the possibility of including in the plea agreement a "null and void" clause informing the defendant of the consequences which would attach if he failed to comply with his obligations under the plea agreement.

On July 6, 1989, San Pedro, Sharpstein, and Outerbridge each executed a plea agreement. *See* Government's Exhibit 2.

Notwithstanding each party executing the initial agreement, the parties never presented that agreement to the Court.

Outerbridge drafted a second plea agreement, which Lehtinen reviewed. Outerbridge executed it on July 6, 1989. Sharpstein executed this second agreement on July 10, 1989, and San Pedro signed the agreement on July 11, 1989. This second plea agreement, which was the agreement Judge Aronovitz approved and accepted, and which is binding on the parties herein, provides as follows:

The United States of America and the defendant, ALBERTO SAN PEDRO, do hereby enter into the following plea agreement:

1. The defendant, ALBERTO SAN PEDRO agrees to plead guilty to Count I of Indictment Number 88–0677–Cr–ARONOVITZ charging him with conspiracy to commit bribery of a federal public official and to receive embezzled Federal Bureau of Investigation property in violation of Title 18, United States Code, Section 371. Such charge carries with it a maximum term of five (5) years imprisonment, a ten thousand dollar ($10,000.00) fine, or both.

2. The defendant, ALBERTO SAN PEDRO, agrees to provide complete, candid and truthful information concerning all areas of inquiry of the federal government, including, but not limited to, interviews and testimony before grand juries and testimony at any subsequent trials. Defendant SAN PEDRO's testimony shall include complete, candid and truthful information with regard to any and all criminal activities within the jurisdiction of the United States of which he is aware.

3. The defendant, ALBERTO SAN PEDRO, agrees to voluntarily dismiss his post-conviction appeal before the District Court of Appeal—Third District of Florida (Case No.'s 88–01575 and 88–02701).

4. The State Attorney of the Eleventh Judicial Circuit of Florida, in consideration of the defendant's dismissal of the aforementioned post-conviction appeal,

and in further consideration of the defendant's compliance with the terms and conditions of this plea agreement, will *nolle prosse* all criminal charges currently pending against the defendant before the Circuit Court—Eleventh Judicial Circuit of Florida.

5. The United States, in consideration of the defendant's compliance with the terms and conditions of this Plea Agreement, agrees not to prosecute ALBERTO SAN PEDRO for any other offenses based upon any evidence revealed in the investigation that led to the charges in the subject indictment. In addition, the United States agrees not to prosecute ALBERTO SAN PEDRO based upon any other evidence of which it is now aware or which, with the exercise of reasonable diligence, it could presently become aware through communication with state or local law enforcement personnel.

6. The United States, in consideration of the defendant's compliance with the terms and conditions of this Plea Agreement, agrees to move for the dismissal of Counts II and III of Indictment Number 88-0677-Cr-ARONOVITZ at the time of defendant SAN PEDRO's sentencing.

7. The United States, in consideration of the defendant's compliance with the terms and conditions of this Plea Agreement, further agrees that it will inform the Court through the Probation Department and at the time of sentencing, of the nature, extent and quality of ALBERTO SAN PEDRO's cooperation with the government. It is the parties' understanding that defendant SAN PEDRO may receive a sentence ranging from probation to not more than five years incarceration and/or a fine of up to ten thousand dollars ($10,000.00). Although this plea agreement does not obligate the United States to make any specific sentence recommendation at the time of sentencing, the United States reserves the right to make such a recommendation should it desire to do so. Furthermore, the United States agrees that it would be reasonable and appropriate for the Court to impose a sentence in accordance with Title 18, United States Code, Section 4205(b)(2), in the event that the defendant has complied fully with the terms and conditions of this Plea Agreement.

8. The parties hereby agree that this document represents the full, complete and only agreement between the United States and the defendant, ALBERTO SAN PEDRO, regarding this matter, and that no promises or representations have been made which are not set forth herein. Additionally, any changes or modifications to this agreement must be in writing and signed by all parties.

Defendant's Exhibit 1.

Under the terms of the plea agreement, San Pedro agreed to plead guilty to count I of the federal indictment, to dismiss his appeal of his state court conviction, and to cooperate with the United States government by providing complete, candid, and truthful testimony with regard to any criminal activities within the jurisdiction of the federal government of which he is aware. In return, the government made various promises, including a promise not to prosecute San Pedro based upon any evidence of which it was then aware or of which it could become aware through the exercise of reasonable diligence. The offenses alleged in the instant indictment are covered by this provision. The plea agreement contained no language informing the defendant what constituted a breach of the agreement or informing him of the consequences which would follow if he did breach the plea agreement.

On July 12, 1989, Judge Aronovitz conducted a hearing to permit San Pedro to change his plea to guilty. At the hearing, Lehtinen and Outerbridge represented the United States; Sharpstein and Kyle represented San Pedro. Judge Aronovitz sealed the plea agreement and did not read it to the defendant at the hearing. Judge Aronovitz merely mentioned the defendant's willingness to plead guilty to count I. Lehtinen spoke for the government and acknowledged that the government was satisfied with the agreement. San Pedro and his counsel indicated their satisfaction with the terms, and Judge Aronovitz accepted the plea and adjudicated San Pedro

guilty on count I. Judge Aronovitz set sentencing for Monday, September 11, 1989. There was no discussion by anyone present at the hearing regarding what conduct would constitute a breach of the plea agreement by San Pedro or what consequences would adhere if San Pedro did in fact breach the agreement.

B. Period of Cooperation

At the time San Pedro pleaded guilty, the federal government was embroiled in an extensive corruption investigation of various elected officials in Hialeah, Florida, including Mayor Raul Martinez. Assistant United States Attorneys Steven Chaykin and Bruce Udolf were responsible for the Hialeah investigation. Because of his involvement with the players in Hialeah politics, the government sought to use San Pedro as a government witness in the investigation.

Special agents Martin Ruiz de Gamboa and Edward Leon were responsible for debriefing San Pedro. The agents debriefed San Pedro on August 4, 11, and 15, 1989, and again on September 16, 1989. The agents summarized the extensive information obtained from the defendant in three FBI reports. *See* Defendant's Exhibits 3–5, under seal. Finally, on September 26, 1989, the defendant testified before the grand jury investigating the corruption in Hialeah, being questioned throughout by Chaykin and Udolf.

After continuing the original sentencing hearing to allow San Pedro to cooperate further, Judge Aronovitz sentenced the defendant on September 28, 1989. At the sentencing hearing, Outerbridge represented the government and expressly recommended that San Pedro be released immediately and placed on probation for a period of six months to facilitate San Pedro's further cooperation. Outerbridge also recommended that, irrespective of the sentence imposed, San Pedro be immediately eligible for parole pursuant to 18 U.S.C. § 4205(b)(2).

Judge Aronovitz adopted the government's recommendation of immediate parole eligibility but still sentenced San Pedro to thirty months in prison. *See* Defendant's Exhibit 10. Judge Aronovitz credited San Pedro for all the time he served in federal custody as a result of these charges from October 18, 1988, to the date of sentencing. *Id.* San Pedro ultimately was paroled on December 20, 1989.

On April 3, 1990, a grand jury returned an indictment against Hialeah Mayor Raul Martinez and Hialeah City Commissioner Andrew Mejides, at least in part based upon the grand jury testimony of San Pedro. A jury ultimately convicted Martinez, and Mejides pleaded guilty.

As described by the government itself, San Pedro's contribution to the government's investigation of the corruption in Hialeah politics was substantial, truthful, and invaluable. For example, in a letter to the United States Parole Commission dated October 3, 1989, Assistant United States Attorney Outerbridge, in support of his request that San Pedro be given an "out-of-institution" parole hearing, stated:

I feel compelled to inform you that Mr. San Pedro has spent *substantial* periods of time with agents of the F.B.I. and various Assistant United States Attorneys throughout the period of time that has elapsed between his guilty plea in July and his recent sentencing last week. During these encounters Mr. San Pedro has provided critical and important information with regard to numerous matters of interest to the F.B.I. and my office. In this regard, Mr. San Pedro has candidly and unreservedly supplied testimony and information that has been of invaluable assistance to the government with regard to corrupt activities on the part of numerous municipal officials in the City of Hialeah, Florida, as well as numerous State of Florida officials. These corrupt activities form the cornerstone of an intensive investigation currently examining the criminal conduct of these officials, many of whom still hold public office.

*See* Defendant's Exhibit 12 (emphasis in original).

Further, in a letter dated October 3, 1989, Assistant United States Attorney Chaykin urged the Assistant District Director of the Immigration and Naturaliza-

tion Service to withhold or suspend deportation proceedings against San Pedro because of San Pedro's cooperation. In his letter, Chaykin paints a glowing portrait of San Pedro, tellingly indicating the extent of San Pedro's cooperation with the government:

The assistance provided by Mr. San Pedro exceeded our expectations. His cooperation included submitting to hundreds of hours of interviews with agents of the Federal Bureau of Investigation, providing the names and locations of other witnesses, assisting in obtaining the cooperation of witnesses, and providing sworn testimony before a Federal Grand Jury. Mr. San Pedro's assistance and testimony were relied upon in a significant corruption indictment against elected officials of a major municipality in Dade County. Mr. San Pedro's cooperation also includes, of course, testifying during the trial of these elected officials. It should be noted that Mr. San Pedro is continuing to cooperate with the United States in other on-going investigations.

See Defendant's Exhibit 13, at 2.

### C. Organized Crime Section's Investigation

From July 1989 to December 1990, San Pedro regularly met with special agents Ruiz de Gamboa and Leon. For most of this period, while San Pedro was incarcerated, San Pedro was hesitant to discuss the activities of Robert Erra, apparently out of fear that Erra would harm San Pedro's family while San Pedro was in prison. However, on October 4, 1990, during a meeting with Ruiz de Gamboa and Leon, San Pedro volunteered information concerning his involvement with Erra. The agents found it unusual that San Pedro would volunteer this information and took it as an indication that San Pedro finally trusted them. The agents summarized the information in a report, but never followed up with additional questioning concerning Erra or San Pedro's dealings with him.

In October of 1990, a task force comprised of FBI agents and Metro–Dade police officers was conducting an investigation of San Pedro, Erra, and others. The task force officers were seeking a federal prosecution of the subjects. In fact, a Metro–Dade detective had asked Ruiz de Gamboa whether he knew of any of San Pedro's associates. Within one or two days of his and Leon's October 4, 1990, meeting with San Pedro, Ruiz de Gamboa informed the Metro–Dade detective about the information San Pedro had provided.

On October 30, 1990, the task force officers met with Assistant United States Attorney Scott Behnke—Chief of the Special Investigation Division of the United States Attorney's office. The task force officers presented to Behnke the results of their investigation, including alleged evidence of homicides, extortion, gambling, drug trafficking, and money laundering.

On November 5, 1990, Behnke first met with Assistant United States Attorney Diana Fernandez regarding the task force investigation. Behnke intended to assign the case to Fernandez if it was accepted for prosecution. Soon, wind of the contemplated Organized Crime Section prosecution reached Outerbridge. No doubt because of the obvious relevancy of San Pedro's plea agreement to the potential prosecution of San Pedro, Outerbridge provided Behnke with a copy of San Pedro's plea agreement on November 8, 1990. Behnke provided Fernandez with a copy of the agreement the next day. On November 13, 1990, Behnke and Fernandez met with the task force officers to discuss the investigation; however, they did not inform the officers of San Pedro's plea agreement because the case had not yet been accepted for prosecution.

In the days that followed Behnke's and Fernandez' discovery of San Pedro's plea agreement, a blizzard of activity was undertaken to assess the extent of San Pedro's cooperation to date and to determine the breadth of the government's obligations under the plea agreement. On November 16, 1990, Behnke and Fernandez met with Outerbridge to discuss the history of the defendant's cooperation. On November 20, 1990, Fernandez discussed the defendant's cooperation with Assistant United States Attorney Chaykin. Both

Chaykin and Assistant United States Attorney Udolf expressed their concern that any prosecution of San Pedro would constitute a breach of the plea agreement. Finally, on November 22, 1990, Behnke assigned Assistant United States Attorney Jeffrey Kay the task of interviewing the FBI agents who had debriefed San Pedro. Behnke also instructed Kay to examine the plea agreement to determine the nature of any continuing obligations incumbent on the defendant and the government. Fernandez briefed Kay on the subjects of the task force investigation.

Kay interviewed the agents and learned that San Pedro had been fully cooperative. Kay also learned that San Pedro had volunteered information to Ruiz de Gamboa and Leon concerning some topics which were the subject of the task force investigation. However, the agents informed Kay that there had been no full debriefing of San Pedro concerning those areas.

On December 4, 1990, Kay interviewed Outerbridge regarding the plea agreement. Outerbridge expressed concern about the federal government breaching the immunity portion of its agreement with San Pedro. Outerbridge also was troubled that any prosecution of San Pedro would taint any state investigation of homicides and narcotics violations.

On December 6, 1990, Kay met with Assistant United States Attorney Linda Collins Hertz. Kay provided Hertz with a copy of the plea agreement. Kay did not provide Hertz with any additional information regarding his inquiry. Hertz believed that the agreement bestowed some form of transactional immunity upon San Pedro.

On December 11, 1990, Kay, Behnke, Fernandez, and Hertz met and discussed the plea agreement and Kay's findings. Kay told the others that San Pedro had been cooperating with the FBI and that San Pedro had not done anything which could be construed to be a breach of the plea agreement. Kay also informed the others that San Pedro had volunteered relevant information to Ruiz de Gamboa and Leon, but the agents had not conducted any follow-up interviews of the defendant.

Finally, Kay told the others that the United States would "look awful silly" if it tried to argue to a Court that the defendant had breached the plea agreement. After Linda Hertz provided her opinion on the situation, the attorneys concluded that the defendant had not breached the plea agreement and could not be indicted at that time.

On December 14, 1990, Behnke and Fernandez met again with the task force officers. It was on this occasion that Behnke and Fernandez informed the officers and agents of the government's agreement with San Pedro. Behnke and Fernandez provided the officers with an opportunity to discuss the ramifications of the plea agreement and to decide whether they still wished to prosecute the case in federal court. Ultimately, the task force members advised Behnke that they still desired to proceed in federal court. Behnke complied with their request and accepted the case for prosecution.

Several other significant events occurred in December of 1990. At some point, the United States Attorney's office directed FBI agents Ruiz de Gamboa and Leon—the two agents who had developed a rapport with San Pedro during his long period of cooperation—to have no further contact with San Pedro. Later, a Metro–Dade detective took several boxes of evidence from Ruiz de Gamboa. Although Ruiz de Gamboa offered to assist the detective in debriefing San Pedro, no one ever contacted him to undertake such a task. Further, on December 7, 1990, Hialeah City Commissioner Andrew Mejides pleaded guilty, obviating the need for San Pedro to testify in the Hialeah corruption case.

### D. The Grand Jury

On December 17, 1990, Lehtinen and Behnke submitted a case initiation report to the Organized Crime and Racketeering Section of the United States Department of Justice. *See* Court Exhibit 1. The report named Erra, Carlos Redondo, Lester Steiner, and Jose Villanueva as defendants. The report stated that the government only contemplated using San Pedro as a witness because of his plea agreement.

Because of statute of limitations concerns, Fernandez was forced to act quickly to put the case together. On January 3, 1991, Fernandez issued thirty grand jury subpoenas, including one to San Pedro. Because of a typographical error, San Pedro's subpoena required his appearance on January 29, 1991. Actually, Fernandez wanted San Pedro to appear before the grand jury on January 15, 1991.[3]

The subpoena took San Pedro, his family, and his attorneys by surprise. Notwithstanding his extensive cooperation, the United States Attorney's office had decided that no agent of the government would talk to San Pedro except on the record in the grand jury. After Fernandez served San Pedro with the subpoena, San Pedro's wife asked Udolf and Ruiz de Gamboa to meet with her. Udolf and Ruiz de Gamboa agreed and, during their meeting, told Mrs. San Pedro that they did not cause the subpoena to be issued and that Fernandez was the one to talk to regarding the grand jury investigation. Ruiz de Gamboa informed Mrs. San Pedro that he felt bad about what had happened. During the week of January 5, 1991, San Pedro's attorneys—Fred Schwartz, Sharpstein, and Kyle—each unsuccessfully attempted to reach Fernandez, but Fernandez was out of town attending a seminar.

Finally, on January 14, 1991, Fred Schwartz was able to speak with Fernandez. Schwartz asked Fernandez why she had subpoenaed San Pedro. Fernandez declined to answer. Schwartz also offered to produce the defendant for debriefing and outlined four areas in which the defendant might assist the government. Fernandez rejected his offer and stated that a debriefing was impossible. Significantly, the government debriefed all but six other witnesses who testified before the grand jury in connection with this indictment; however, unlike San Pedro, each of those six witnesses refused to speak to Fernandez or the agents prior to their grand jury appearance. San Pedro was the only witness willing to be debriefed that the government refused to debrief.

In response to an inquiry by Fernandez, Schwartz agreed to produce San Pedro to testify on January 16, 1991. Fernandez never inquired of Schwartz whether San Pedro intended to invoke his fifth amendment privilege in the grand jury.

On January 16, 1991, San Pedro appeared before the grand jury without having been debriefed by any agent of the government. Once in the grand jury, Fernandez informed San Pedro that he was not a target of the grand jury investigation. Fernandez did advise San Pedro that his status could change from witness to target; she stated, however, that she would advise Schwartz of any change.

During his testimony San Pedro answered various questions posed by Fernandez. However, when asked by Fernandez whether he had ever been known under the alias of "Danny" he declined to answer, and instead read the following statement provided by his attorney:

Ladies and Gentleman, I want to help the Government in any way I can, considering my plea agreement that I have. However, since my attorney has not fully advised as to the details of this investigation, he has informed me that he cannot advise me whether it covers my immunity portion of my plea agreement. So I have.... So I have—regrettably have to assert my Fifth Amendment privilege against self-incrimination until my attorney can advise me that I have immunity, full immunity, or until he receives further immunity instructions.

Court's Exhibit 2, at 8.

After San Pedro read the statement, Fernandez moved on to other topics. After a period of exchange, Fernandez asked San

---

**3.** In late December of 1990, Fernandez prepared a Request For Authorization To Apply For Compulsion Order relating to San Pedro for submission to the Justice Department. However, First Assistant United States Attorney Marcella Cohen recommended to Dexter Lehtinen that he refuse to submit the request on the ground that it would be necessary for San Pedro to invoke his fifth amendment privilege on the record in the grand jury before use immunity would be requested. The U.S. Attorney's office never submitted this initial request to the Justice Department.

Pedro whether he knew an individual named Gary Teriaca. San Pedro asked to speak with his attorney, and Fernandez grudgingly complied. When San Pedro returned to the grand jury room, Fernandez again asked San Pedro whether he knew Gary Teriaca. Again San Pedro expressed concern about the breadth of his immunity agreement. After another session with his attorney, San Pedro returned and faced the Teriaca question for the third time. In response, San Pedro read the following statement prepared by Schwartz:

I want to help the government in any way I can considering my plea agreement. I resent my attorney has not been fully advised as to the details of this investigation. He has informed me that he cannot advise me whether it is convenient by—is covered by the immunity portion of my plea agreement though I regretfully have to assert my Fifth Amendment privilege against self-incrimination until my attorney can advise me that I have immunity or until I receive formal immunity.

*Id.* at 35–36. After more questions, many of which San Pedro responded to by invoking his fifth amendment privilege against self-incrimination, the grand jury foreperson excused San Pedro until January 29, 1991.

On January 18, 1991, Lehtinen, Outerbridge, Behnke, Fernandez, Kay, and First Assistant United States Attorney Marcella Cohen all met to discuss the propriety of conferring use immunity upon San Pedro. At the conclusion of the meeting, Lehtinen decided to confer use immunity upon San Pedro. Accordingly, the government obtained authorization from the Justice Department to apply for a compulsion order on January 24, 1991. The government then submitted a formal application to the Court for an order compelling San Pedro's testimony, and United States District Judge William Hoeveler signed the order.

On January 30, 1991, San Pedro returned to the grand jury, again without having been debriefed, and again notwithstanding Schwartz' offer to Fernandez to produce the defendant for debriefing. On this occa-

sion, Fernandez and Behnke represented the government in the grand jury room. Before commencing her examination of San Pedro, Fernandez read to him the immunity provision of his plea agreement and Judge Hoeveler's compulsion order. *See* Court's Exhibit 3, at 2–11. Fernandez informed the defendant that the government could prosecute him for perjury if he failed to testify truthfully. Fernandez never told San Pedro that his failure to testify truthfully would constitute a breach of his plea agreement and would allow the government to prosecute him for all conduct covered by the immunity provision of his plea agreement.

San Pedro answered Fernandez' questions. At the completion of the questioning, the grand jury directed San Pedro to return on February 4, 1991. Judge Hoeveler ultimately continued San Pedro's appearance to February 12, 1991. However, San Pedro would never return to the grand jury.

### E. From Witness To Defendant

On January 31, 1991, Fernandez obtained an expedited transcript of San Pedro's grand jury testimony. She then instructed task force agents to review the transcript and inform her whether they believed San Pedro had lied.

On February 1, 1991, Fernandez concluded that San Pedro had lied in the grand jury. Consequently, she decided to seek an indictment against San Pedro for perjury. Moreover, because she believed that San Pedro's alleged perjury constituted a breach of the plea agreement, she reasoned that the government was free to disregard its promise of immunity. As a result, she also sought to indict San Pedro for the conduct which was the topic of the pending task force investigation of Erra and the others, and which the government admits is covered by the immunity provision of the plea agreement.

Fernandez called the Justice Department and requested an "on site review" to obtain approval to indict an immunized witness. She also filed a memorandum with George Proctor, Deputy Chief of the Organized Crime and Racketeering Section of the Jus-

tice Department's Criminal Division, seeking authorization to indict the immunized San Pedro. Fernandez requested expedited consideration of her request because she believed that the task force case had to be indicted by February 17, 1991, or it would be barred by the applicable limitation period.

On February 11, 1991, Fernandez submitted to the Justice Department a fifty-one page prosecution memorandum which included San Pedro as a defendant in a proposed RICO indictment. Court's Exhibit 8, under seal. On February 12, 1991, Fernandez submitted a thirteen page memorandum outlining the alleged conflicts between San Pedro's testimony and that of the other witnesses who had appeared before the grand jury. *See* Court's Exhibit 9. On February 15, 1991, Dick Thornburgh, the Attorney General of the United States, authorized the indictment of San Pedro. *See* Court's Exhibit 10. A grand jury returned the subject indictment on the same day.

Upon return of the indictment, the government filed a motion to seal the indictment. The government contended that it would take one month to coordinate the arrests of the defendants. United States Magistrate Judge Ted Bandstra granted the motion and entered an order sealing the indictment.

On March 27, 1991, a separate grand jury returned an indictment charging San Pedro with perjury during his grand jury testimony on January 30, 1991. *See United States v. San Pedro*, No. 91–214–CR–KING. Again the government moved to seal the indictment, and Magistrate Judge Bandstra granted the motion and sealed the indictment.

On April 1, 1991, Magistrate Judge Lurana S. Snow unsealed the RICO indictment. Prior to that time, neither San Pedro nor his attorneys were ever advised that San Pedro's status had changed from witness to target, despite Fernandez' express promise on the record in the grand jury on January 16, 1991, that she would so advise San Pedro's lawyer.

After his arrest, San Pedro pleaded not guilty to the charges in both indictments. The Court ordered San Pedro detained prior to trial. The Court ultimately revisited the bond issue and granted San Pedro a bond. San Pedro eventually posted the bond and was released.

In November of 1991, the defendant was tried on the perjury charges before United States District Judge James Lawrence King. At the close of the government's case, Judge King directed a judgment of acquittal on four of the seven perjury counts. *See* Notice To Court, at 1 (filed December 4, 1991). Judge King allowed the remaining three counts to go to the jury. *Id.* On November 29, 1991, the jury returned a verdict of not guilty on each of the three remaining perjury counts. In sum, San Pedro was completely acquitted of all perjury charges.

## II. Discussion

The Court has conducted a *de novo* review of the record herein, it has considered the findings of the magistrate judge and her recommendations, and it has carefully reviewed the arguments of the parties. After *de novo* review, the Court will adopt in part and reject in part the magistrate judge's factual findings. The Court will adopt the magistrate judge's recommendation on the ultimate disposition of the motion and will grant San Pedro's Motion To Dismiss the Indictment. However, the Court rests its decision on grounds different from those relied upon by the magistrate judge.

### A. Factual Findings

On October 21, 1991, United States Magistrate Judge Lurana S. Snow submitted a Report recommending the Court grant San Pedro's motion to dismiss the indictment. Based on the evidence and testimony she received during the evidentiary hearing, Magistrate Judge Snow began her Report by making factual findings. The magistrate judge divided her factual findings into two sections: (1) "disputed facts" and (2) "undisputed facts." The Court will address each section separately.

### 1. Undisputed Facts

The Court will adopt the magistrate judge's statement of undisputed facts and expressly incorporates that statement herein. Any objection to any finding in that section is overruled.

### 2. Disputed Facts

With certain exceptions, the Court will adopt the magistrate judge's statement of disputed facts. The Court will not ratify or adopt the magistrate judge's finding that Assistant United States Attorneys Marcella Cohen, Scott Behnke, and Diana Fernandez deliberately misled the Court. As to Fernandez, the Court has reviewed the relevant testimony and notes that Fernandez' testimony is at times inconsistent with that of other witnesses. Further, the Court notes, as the magistrate judge so found, that at times Fernandez' and Behnke's testimony was implausible and contrary to common sense. Nonetheless, the Court cannot, based on the review of a cold record and in light of the testimony of all parties, make a finding that Behnke and Fernandez deliberately lied when they testified before Magistrate Judge Snow. Moreover, such a finding is unnecessary to the Court's ruling on the defendant's motion.

It remains possible that Behnke and Fernandez deliberately lied. The Court does not chastise the magistrate judge for concluding that they did. She had an opportunity to assess their demeanor and she made her finding. However, because of the gravity of the allegation, because of the chill of the record, and because the findings are unnecessary to the disposition of the defendant's motion, the Court will not ratify her conclusion based upon a mere reading of the transcript.

As to Marcella Cohen, upon a review of her testimony, the Court is convinced that she did not deliberately mislead the Court. She did not testify on the issue of how San Pedro would be used in the present prosecution. Cohen's involvement in this matter was minimal and her recollection of the events was admittedly poor. Cohen may have been foolish for at times attempting to testify about facts of which she had no clear recollection. However, it does not appear that she deliberately lied. The Court accepts her testimony as truthful.

In sum, the Court will not adopt that portion of the magistrate judge's report which expressly or impliedly finds that Fernandez, Behnke, and Cohen deliberately lied, especially paragraph 18 on page 53 of the Report. Accordingly, any express or implied finding in the magistrate judge's report that Fernandez, Behnke, or Cohen deliberately lied in their testimony is not incorporated into this order.

Notwithstanding the Court's rejection of the magistrate judge's finding that Behnke, Fernandez, and Cohen deliberately lied in their testimony, the Court is still convinced, as the magistrate judge was, that the evidence before the Court, objectively viewed, and irrespective of any fabrication on the part of the prosecutors, reveals that the attorneys representing the United States acted to cause San Pedro to breach his plea agreement. The Court has considered the contrary evidence referenced in the government's objections; but, that evidence does not persuade the court to find otherwise. Accordingly, with the exceptions noted above, the Court will adopt the magistrate judge's findings as recited in her statement of disputed facts.

### B. Legal Analysis

■ A plea agreement is a contract between the defendant and the United States. Therefore, although constrained at times by due process implications, commercial contract principles govern the interpretation and enforcement of plea agreements. *United States v. Jefferies*, 908 F.2d 1520, 1523 (11th Cir.1990). Indeed, the Court will rely on commercial contract principles to justify its decision to grant San Pedro's motion to dismiss.

### 1. Did San Pedro Breach The Plea Agreement?

The threshold, and potentially dispositive, issue created by San Pedro's motion is whether San Pedro did in fact breach his plea agreement in the grand jury on Janu-

ary 30, 1991.[4] If San Pedro did not, the United States breached the agreement when it indicted him and he is entitled to recourse. If he did, the Court's analysis must proceed on that basis.

■ A preliminary question exists on the propriety of the Court even passing on the issue of San Pedro's breach. The magistrate judge recommends that the Court defer to the finding of the jury in the government's perjury case against San Pedro on the issue of whether San Pedro breached the plea agreement. That jury acquitted San Pedro of the government's charge that he committed perjury in the grand jury. The government objected to the magistrate judge's finding. The Court will sustain the government's objection.

The factual determination of whether the plea agreement has been breached is one for the district judge and is to be made independent of a jury's verdict on a perjury charge. *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 578 (1st Cir.), *cert. denied sub nom. Latorre v. United States*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *United States v. Verrusio*, 803 F.2d 885, 894–95 (7th Cir.1986). This is so primarily because the government has a higher burden of proof in a perjury trial than it does when endeavoring to demonstrate that a defendant has breached a plea agreement. Where the government seeks to convict someone for perjury it must prove the elements of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). In contrast, when the government seeks to prove that a defendant has breached a plea agreement it must prove the breach by a preponderance of the evidence. *United States v. Verrusio*, 803 F.2d 885, 894 (7th Cir.1986).

■ In executing his plea agreement San Pedro agreed "to provide complete, candid and truthful information concerning all areas of inquiry of the federal government, including, but not limited to, interviews and testimony before grand juries and testimony at any subsequent trials." Defendant's

Exhibit 1, at ¶ 2. San Pedro also agreed "to provide complete, candid and truthful information with regard to any and all criminal activities within the jurisdiction of the United States of which he is aware." *Id.* The United States contends that San Pedro materially breached these obligations when on January 30, 1991, he gave false, misleading, and deliberately incomplete testimony before a grand jury of this Court.

The government claims that San Pedro breached the plea agreement; therefore the government bears the burden of proving the breach by a preponderance of the evidence. *United States v. Verrusio*, 803 F.2d 885, 894 (7th Cir.1986). To prove the breach, the United States has submitted to the Court transcripts of the grand jury testimony of San Pedro, Joseph Quinones, Patricia Frankel, Manuel Revuelta, Raul de la Milera, Bruce Copelan, and Mark Baer. The government asks the Court to compare San Pedro's testimony with that of the other witnesses. The government contends that the conflicts between San Pedro's testimony and that of the other witnesses proves by a preponderance of the evidence that San Pedro breached the agreement on January 30, 1991, by failing to provide complete, candid, and truthful testimony before the grand jury.

The Court has examined the grand jury testimony of San Pedro and the other witnesses and has considered the arguments of the parties regarding the alleged conflicts in the testimony and the credibility of the witnesses. After this review, the Court finds that the government has not met its burden of demonstrating to the Court by a preponderance of the evidence that San Pedro failed to provide complete, candid, and truthful testimony before the grand jury as he was required to do under paragraph 2 of his plea agreement. Accordingly, the Court finds that the government has failed to prove by a preponderance of the evidence that San Pedro breached his plea agreement on January 30, 1991.

---

**4.** The United States conceded at oral argument that the only conduct it alleges as a breach by San Pedro of his plea agreement was his grand jury testimony on January 30, 1991.

As the government has not proved that San Pedro breached the plea agreement on January 30, 1991, and because the government does not allege that he committed a breach on any other date, the parties were bound by the plea agreement on February 15, 1991. On that date, contrary to the obligation it assumed in paragraph 5 of the plea agreement, the United States indicted San Pedro for offenses covered by the immunity provision of the plea agreement. In obtaining this indictment, the United States breached the plea agreement. As recourse for this breach, the defendant asks the Court to require specific performance on the part of the government and, in fact, to assist the government in performing its obligation by dismissing the indictment. The Court will grant the defendant's request and will enforce the government's promise by dismissing the indictment. *See Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *United States v. Tobon–Hernandez*, 845 F.2d 277, 280–81 (11th Cir.1988).

2. Alternative Grounds For Dismissal

In the previous section, the Court found that San Pedro did not breach his obligation of providing the government with complete, candid, and truthful testimony. Accordingly, the Court concluded that dismissal of the indictment is warranted because the United States, and not San Pedro, is in breach of the plea agreement.

In this section, the Court will explain that *even if* the Court were to assume that San Pedro *did* breach the agreement during his January 30, 1991, grand jury appearance, (and the Court emphatically does not so find) dismissal is still warranted.

The Court is convinced that in the weeks leading up to San Pedro's January 30, 1991, grand jury testimony, the government endeavored to cause San Pedro to breach his plea agreement and that any breach on January 30, 1991, if it occurred, was precipitated by the actions of agents of the United States government. Because the United States caused the alleged breach of which

it complains, dismissal would be warranted on two grounds.

The Court will explain each ground separately.

a. Government's Breach of its Duty of Good Faith & Fair Dealing

■ In her report, the magistrate judge explained that one ground for her recommending dismissal was the government's failure to make a good faith effort to abide by its obligations under the plea agreement. The Court will explain in a slightly different fashion why the government's failure to act in good faith warrants dismissal. Again, the law of contracts informs the Court's analysis.

Where the express terms of a contract do not speak to an issue which arises under the contract, it is often incumbent upon a court to determine whether to supply a term to deal with the omission. San Pedro's plea agreement does not expressly address the consequences of a breach of the agreement. Notwithstanding the plea agreement's silence on the issue, courts regularly supply a term imposing on both parties to a contract a duty of good faith and fair dealing. Indeed, the Restatement of Contracts clearly recognizes that such a duty exists in every contract: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1981). *See also* U.C.C. § 1–103.

For the purposes of its analysis, the Court will assume that the government's duty not to prosecute San Pedro for the offenses covered by the immunity provision of the plea agreement was conditional upon San Pedro providing complete, candid, and truthful testimony.[5] In other words, the Court assumes that San Pedro's providing complete, candid, and truthful testimony was a condition to the government's duty of non-prosecution: if San Pedro failed to testify truthfully and completely, the government would be released from its promise to not prosecute him.

---

**5.** The Court must make this assumption because there is no language, such as a null and void clause, making the government's duty not to

prosecute San Pedro expressly conditional upon San Pedro's giving truthful grand jury testimony.

The duty of good faith and fair dealing which is implicit in the plea agreement, and is binding on both parties, prohibited the government from taking any action to prevent full performance by both parties. In other words, the government's duty of good faith and fair dealing required it to refrain from taking any action to prevent San Pedro from providing complete, candid, and truthful testimony. The government could not void its contract of immunity by provoking or causing a breach.

In breach of that duty, the government was the cause of San Pedro's providing incomplete, less than candid, and untruthful testimony in the grand jury on January 30, 1991, if, in fact, he did so. In so doing, the government breached its duty of good faith and fair dealing. Because the government's own conduct may have caused the condition of its duty of non-prosecution not to occur, its duty not to prosecute thereupon became absolute. *See Vanadium Corp. of America v. Fidelity & Deposit Co. of Maryland,* 159 F.2d 105 (2d Cir.1947); *Foreman State Trust & Savings Bank v. Tauber,* 348 Ill. 280, 180 N.E. 827 (Ill.1932); *Kooleraire Service & Installation Corp. v. Board of Education,* 28 N.Y.2d 101, 320 N.Y.S.2d 46, 268 N.E.2d 782 (N.Y.1971); *Fay v. Moore,* 261 Pa. 437, 104 A. 686 (Pa.1918).

In sum, where the parties to a plea agreement have conditioned a government promise of immunity upon the continued truthful cooperation of a defendant, the government cannot act to prevent the occurrence of the condition. Where the government does act to prevent the occurrence of the condition, the government violates its duty of good faith and fair dealing and excuses the condition of truthful cooperation. Essentially, the government's promise of immunity becomes unconditional.

That is exactly what happened here.

The government committed the first material breach of the plea agreement when it violated its duty of good faith and fair dealing. The government's breach made the government's duty of non-prosecution absolute, *even if* San Pedro did testify untruthfully in the grand jury on January 30, 1991.

Accordingly, the government's indictment of San Pedro is in violation of its promise of immunity in paragraph 5 of the plea agreement and cannot stand. *See Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

### b. Propriety of Rescission

Finally, and again proceeding on the assumption that the government caused San Pedro to breach the plea agreement in the grand jury, (and be it remembered that this Court has herein found that San Pedro did *not* breach the agreement) the Court believes that there is an additional ground for granting the defendant's motion.

The propriety of the Court relying on this final ground as an additional basis for its ruling depends upon how the Court characterizes the relief the government seeks because of San Pedro's alleged breach.

The government calls the relief that it seeks a "release." The defendant characterizes it as seeking "rescission."

The defendant argues in his Post–Hearing Memorandum that even *if* he breached the agreement on January 30, 1991, the government is not entitled to "rescind" the agreement. Although the defendant has advanced three facially attractive reasons why the government may not rescind, the Court will expressly rely on just one.[6]

### i. Rescission v. Release

■ As noted, the propriety of the Court adopting this alternative ground for decision depends upon how the Court characterizes the remedy the government seeks.

The government has gone to great lengths in trying to convince the Court that, contrary to the defendant's contention, the remedy the government seeks is

---

**6.** San Pedro also argues that the government is not entitled to rescind because he has substantially performed his obligations under the plea agreement and because it is impossible to return him to the status quo. Again be it remembered that, *inter alia,* San Pedro served a term of fourteen (14) months in federal prison pursuant to the plea agreement.

something it calls "release" and not "rescission." Accordingly, the government contends that the defendant's argument fails when he claims that the government's unclean hands bar its attempts to rescind. The Court disagrees.

The use of the term "release" in the law of contracts appears rather consistent. The Restatement of Contracts defines a "release" as "a writing providing that a duty owed to the maker of the release is discharged immediately or on the occurrence of a condition." Restatement (Second) of Contracts § 284(1) (1981). Similarly, Corbin defines "release" as "a writing manifesting an intention to discharge another from an existing or an asserted duty." 5A Corbin on Contracts § 1238, at 556 (1964). As is plain, both the Restatement and Corbin use the term "release" to refer to a writing which one party executes with the intent to release another party from its obligations under a contract. Neither uses the word to refer to a remedy for breach.

In contrast, the term rescission is used in various ways. For example, "rescission" is used to refer to a "mutual agreement by the parties to an existing contract to discharge and terminate their duties under it." 5A Corbin on Contracts § 1236, at 533 (1964); Restatement (Second) of Contracts § 283 (1981). Courts, rightly or wrongly, also use the term rescission to refer to the remedy sought by a party to a contract where that party claims it is no longer obligated to perform under the contract because the other contracting party has breached. See 5 Corbin on Contracts § 1104, at 558 (1964).

In this latter context, rescission is a possible remedy when one party to a contract terminates performance, and seeks to be excused from its obligations under the contract, in response to a breach by the other party to the contract. That is exactly what occurred here. The government reneged on its promise of immunity, and indicted San Pedro, because it believed San Pedro breached the plea agreement. It is true that the government seeks to be "released" from its obligations under the contract;

however, the law calls this release "rescission." Accordingly, the Court finds that the government seeks rescission when it asks to be relieved of its obligations under the plea agreement because of San Pedro's breach.

### ii. The Government's Unclean Hands Bar Rescission

Rescission is an equitable remedy. *See Castle v. Cohen,* 676 F.Supp. 620, 627 (E.D.Pa.1987); *Resnick v. Goldman,* 133 So.2d 770 (Fla. 3d DCA 1961). Because rescission is an equitable remedy, one who seeks rescission must do so with clean hands. *Great Western Cities, Inc. v. Binstein,* 476 F.Supp. 827, 832 (N.D.Ill.), *aff'd without opinion,* 614 F.2d 775 (7th Cir. 1979). Logically, where the party seeking rescission as a remedy for breach deliberately and in bad faith caused the very breach of which it complains, the party seeking rescission has unclean hands. *Cf. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814–15, 65 S.Ct. 993, 997–98, 89 L.Ed. 1381, *reh'g denied,* 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005 (1945). Accordingly, a party to a contract who in bad faith causes the other contracting party to breach is not entitled to the equitable remedy of rescission as a remedy for that breach.

In the present case, again assuming *arguendo* that San Pedro has breached the plea agreement, the government induced and caused that breach. Accordingly, the government has unclean hands and is not entitled to rescission.

Because the Court will not rescind the plea agreement, the obligations of the parties remain binding. Under the plea agreement the government was obligated to refrain from prosecuting San Pedro. The government obviously has failed to live up to its obligation. Consequently, the charges against San Pedro are in violation of that obligation and cannot stand. *See Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

### 3. Dismissal With or Without Prejudice?

■ Although the Court has decided to dismiss the indictment, another issue arises over whether this dismissal should be with

or without prejudice. The magistrate judge, without comment, has recommended that the Court dismiss the subject indictment *with* prejudice. The government has objected to any dismissal being with prejudice. For the reasons explained below, the Court will sustain the government's objection on this issue, in part.

If the Court were to dismiss the indictment with prejudice, the government, using its own words, would lose the threat of prosecution with which to motivate San Pedro's future cooperation. Assuming, correctly or incorrectly, that the present indictment charges San Pedro with every offense possibly covered by the immunity provision of the plea agreement, and assuming further that the government is entitled to indict San Pedro for the immunized conduct in response to a material breach,[7] a dismissal with prejudice would strip the government of the ability to threaten San Pedro with prosecution for immunized conduct to secure further cooperation.

The Court will take an equitable approach to resolving this issue.

The dismissal will be with prejudice to the extent that the government may not reindict the defendant for the alleged present offenses, or for any other offense covered by the immunity provision of the plea agreement, based upon any alleged breach of that agreement which occurred prior to the date of this order. On the other hand, the Court does not seek completely to deprive the United States of its benefit of the bargain struck in the plea agreement—namely, the cooperation of San Pedro. Therefore, the dismissal will be without prejudice to the extent that if the defendant commits a material breach of the agreement after the date of this order, the government may seek appropriate recourse; hopefully after obtaining an unequivocal *judicial* determination that a breach has in fact occurred.

## III.  Conclusion

The Court has fully explained the legal grounds for granting the defendant's motion. In the end, however, the legal justifications notwithstanding, the Court's decision is influenced by considerations of fairness. Having objectively viewed the evidence of record, the Court remains convinced that the United States undertook a course of conduct intending to force San Pedro to breach his plea agreement, if in fact he did so. The Court believes that the government "set up" San Pedro in an effort to renege on its promise of immunity, after it had derived substantial and invaluable cooperation from him over a fourteen month period.

Having received its benefit from the bargain, namely San Pedro's cooperation, the government sought to deny the defendant the benefit for which he had bargained—immunity from prosecution.

Such conduct on the part of the government is simply unfair and this Court of the United States will not permit it.

In a day when the confidence and trust of the American people in their government ebbs, it is critical that the United States government keep its word and live up to its obligations. If doing so means that it must forego convicting one person of a crime, that is a small price to pay to preserve the integrity of our institutions.

The foundation of the Republic will not crack if the United States fails to put Alberto San Pedro in a federal prison. It will shatter, however, if the American people come to believe that their government is not to be trusted. A deal is a deal, and the government's word must be its bond.

The government's treatment of Alberto San Pedro was wrong. For this Court to permit this prosecution to proceed would be equally wrong. The Court, therefore, will dismiss the charges against San Pedro.

Accordingly, the Court having reviewed the Report and Recommendation of the magistrate judge and the record herein *de*

---

**7.** The Court's reasoning and analysis in this subsection depends upon another assumption: that indictment for the offenses covered by the immunity provision of the plea agreement is a remedy available to the government in the event of breach. The plea agreement is silent on this issue and the Court will not pass on the validity of the assumption.

*novo*, and being otherwise duly advised, it is hereby:

ORDERED and ADJUDGED as follows:

(1) The magistrate judge's Report and Recommendation dated October 21, 1991, is ADOPTED in part. The magistrate judge's statement of undisputed facts is RATIFIED, AFFIRMED, and in all respects incorporated into this order. Except for those findings rejected above in section II(A)(2), the magistrate judge's statement of disputed facts is RATIFIED, AFFIRMED, and in all respects incorporated into this order. The magistrate judge's recommendation on the ultimate disposition of the motion is RATIFIED, AFFIRMED and in all respects made the order of the district court. However, the magistrate judge's recommendations of law which formed the basis for her recommendation are respectfully rejected. The government's objections are SUSTAINED in part, as explained in the body of this order. In all other respects, the government's objections are OVERRULED.

(2) The defendant San Pedro's Motion To Dismiss Indictment is GRANTED. The government's charges against Alberto San Pedro in the subject indictment, *United States v. Alberto San Pedro, et al.*, No. 91–105–CR–GONZALEZ, are DISMISSED. As explained above in section II(B)(3), the dismissal is partially with prejudice and partially without prejudice. The defendant's bond shall stand exonerated and his sureties are discharged.

(3) The United States Attorney's Supplemental Motion To Reject And/Or Strike is GRANTED in part and DENIED in part. To the extent the Court has declined to adopt the magistrate judge's findings that Assistant United States Attorneys Fernandez, Behnke, and Cohen deliberately lied in their testimony before the Court, the motion is GRANTED. In all other respects, the motion is DENIED.

DONE AND ORDERED in chambers at Fort Lauderdale, Florida, this 27th day of December, 1991.